IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCH OF: )
)
1901 CRAIG STREET, ) Magistrate No.   20-1561
MCKEESPORT, PA 15132 ) **[UNDER SEAL]**
)
THE PERSON OF OBADIAH WILLIAMS ) Magistrate No.   20-1562
DOB 6/17/1975 ) **[UNDER SEAL]**

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Andrew Ellenberger, Special Agent of the Drug Enforcement Administration (DEA), being duly sworn, depose and state that:

**INTRODUCTION AND AGENT BACKGROUND**

1)      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 1901 Craig Street, McKeesport, PA 15132 (TARGET LOCATION 1) and THE PERSON of OBADIAH WILLIAMS WITH A DATE OF BIRTH OF JUNE 17, 1975 (TARGET LOCATION 2), further described in Attachment A, for the items described in Attachment B.

2)      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3)      I was hired by the DEA in September of 2010, and I attended the DEA academy for approximately twenty weeks. At the DEA Academy, I was trained in the various aspects of conducting narcotics investigations. In January 2011, I was sworn as a DEA Special Agent, and I am currently assigned to the DEA Pittsburgh District Office in Pittsburgh, PA.  As a DEA Special Agent, I investigate criminal violations of the Federal and State controlled substance laws

including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute, distribution and manufacture of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); and use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b). I have been personally involved in over 100 narcotics investigations, and as such I am familiar with the various methods used by narcotics traffickers to transport, store and distribute narcotics and narcotics proceeds. I have experience with a wide range of investigative techniques, including various types of visual and electronic surveillance, the interception of wire communications, and the debriefing of defendants, witnesses and informants, as well as others who have knowledge of the distribution and transportation of controlled substances, controlled deliveries, use of search and arrest warrants, management and use of informants, pen registers, the laundering and concealing of proceeds from drug trafficking, and the street gangs who participate in these illegal activities.

4)       The information contained in this affidavit has been obtained from a number of sources, to include conversations with other law enforcement officers, surveillance, and information from a confidential source.  I have not set forth everything I know regarding this investigation.

5)       As explained below, there is probable cause to conclude that evidence of violations of Title 21, United States Code, Section 841, relating to the distribution and/or possession with intent to distribute a controlled substance will be found in one or more of the following TARGET LOCATIONS.

**THE SEARCH LOCATION**

6)      This affidavit is submitted in support of a search warrant for the following locations:

A)      **TARGET LOCATION 1:** the residence, curtilage, outbuildings at 1901 Craig Street, McKeesport, PA 15132.

B)      **TARGET LOCATION 2:** the person of Obadiah WILLIAMS, a black male, with a date of birth of 6/17/1975 (also referred herein as "**WILLIAMS**")

7)      Each of the TARGET LOCATIONS is described more fully in Attachment A, the locations may be referred to herein, collectively, as the "TARGET LOCATIONS."  The applied for warrant would authorize the search of the TARGET LOCATIONS and the seizure of evidence described in Attachment B for **TARGET LOCATION 1** and for controlled substances, cellular telephones, and cash for **TARGET LOCATION 2**.

**EVIDENCE COMMONLY GENERATED BY DRUG TRAFFICKING**

8)      I am aware, based upon my training and experience, that the following kinds of evidence have been recovered in a substantial number of searches executed in connection with drug trafficking and illegal firearms possession investigations and that there is probable cause to conclude that such evidence is located at or inside the locations to be searched:

a.   Controlled substances, such as crack, cocaine, heroin and marijuana;

b.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags," microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, inositol, fentanyl, and vitamin B12;

c.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

d.   Personal books, papers, cellular phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

e.   Cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) – it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

f.   Documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

g.   Computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and

retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

h.   Firearms, ammunition, and other dangerous weapons; and

i.   Identification evidence and/or indicia (such as mail, deeds, leases, rental agreements, photographs, bills, and identification documents) that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

9)      Based upon my training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, I am aware that it is generally a common practice for drug traffickers to store their drug inventory, drug-related paraphernalia, and drug-related and personal records (as described above) in their residences, and/or in the residences of relatives or other trusted associates.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, and/or will be "fronted" controlled substances from their suppliers, such record keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances and to keep track of how proceeds are being expended. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past

("pay") and for payments expected ("owe") as to the traffickers' supplier(s) and the traffickers' dealer(s). Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and must keep them immediately available to efficiently conduct their drug trafficking business.

10)     Additionally, the cell phone, in addition to weapons, is a primary tool of the drug trade. Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business. Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones. The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

11)     Specifically, drug traffickers often utilize telephones to negotiate times, places, prices and details for importing, possessing, concealing, and distributing controlled substances, and for arranging the disposition of proceeds derived from the sale of controlled substances. Your Affiant is aware that drug traffickers commonly store, conceal, or carry their cellular telephones on their person so that they can conduct drug transactions at a moment's notice, day or night.

12)     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them. It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular

telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

13)     It is also a generally common practice for traffickers to conceal at their residences, and/or in their vehicles (particularly if they have a trap/hidden compartment), large sums of money, either the proceeds from drug sales or money to be used to purchase controlled substances.  Drug traffickers often make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and money laundering would also typically be maintained in the residences and/or vehicles of those involved in selling drugs or in the residences and/or vehicles of relatives or trusted associates.

14)     Drug traffickers often possess firearms, ammunition, and other dangerous weapons to protect their proceeds, product, and person from others who might attempt to rob them, and to enforce payment from their customers.  Drug traffickers do not typically call the police when they are robbed of their drugs or drug proceeds and they do not typically file lawsuits to recover unpaid drug debts.  As a result, it is common for drug traffickers to arm themselves instead of calling the police or seeking legal recourse.  And because their drug trafficking activities are conducted over an extended period of time, drug traffickers possess firearms, ammunition, and other dangerous weapons for extended periods of time in convenient and safe locations such as their residences, businesses, and vehicles.

15)     When drug traffickers amass proceeds from the sale of drugs, they often attempt to launder/"legitimize" these profits, or otherwise conceal them from discovery by law enforcement.

In an effort to accomplish these goals, drug traffickers often place assets, such as vehicles and residences, in the names of other persons to conceal their true ownership and the manner in which they were acquired.  Records reflecting the implementation of such deceptive practices, such as deeds, titles, and service records, are likely to be found either at the residence and/or vehicles of the drug trafficker or at the residence of the person in whose name the asset is listed.

16)     I am aware that drug traffickers sometimes take trophy photographs of their drugs and drug proceeds and retain them in their residences and/or vehicles.  Your Affiant is aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences.  When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

17)     Drug traffickers often operate under assumed names to conceal their true identities from law enforcement officers and, in so doing, acquire or rent property, services, and personal identification items (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such items, as well as records relating to such items, in their residences, businesses, and vehicles, together with evidence of their true identities.

18)     Drug traffickers commonly conceal their activities from members of the public by transacting their business in a covert manner and/or during the nighttime hours when darkness helps to conceal their activities.  In addition, large-scale drug traffickers often have multiple locations (including residences and/or "stash houses") from which they operate their illegal activities and in which they maintain evidence of said illegal activities.  Finally, it has become common for drug traffickers to utilize computers, cellular telephones, and/or other electronic

media for communication and data-acquisition and data-retention purposes.  It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds.

19)    Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages.  It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear.  Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones.  In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers.  Such numbers can confirm identities of particular speakers and the occurrence of certain events.

20)    As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device.  Storing this information can be intentional, for example, by saving an e-mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files.  Digital information can also be retained unintentionally.

21)    Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone.  In addition to electronic

9

communications, a user's internet activities generally leave traces in the web cache and internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

22)     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

23)     My awareness of these drug trafficking practices, as well as my knowledge of drug use/distribution and money laundering techniques as set forth in this affidavit, arise from, among other things, the following:  a) my own involvement in this and prior drug investigations and

searches during my career, as previously described; b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me of when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) review of thousands of intercepted telephone communications between drug traffickers during which the traffickers have discussed the topics referenced herein.

24)    In addition, as a result of conversations with Assistant United States Attorneys who have prosecuted drug trafficking cases in federal court, I am aware that courts have recognized that, with respect to drug dealers, evidence of their involvement in the drug trade is likely to be found where the dealers reside, even if no drug trafficking was directly observed to occur there. *See United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (collecting cases); and *United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (explaining that, in drug cases, evidence is likely to be found where drug dealers reside).

## PROBABLE CAUSE

25)    Note: At times in this Affidavit, your affiant will substitute specific quantities, amounts, dates, and or/locations, with vague terms in an attempt to protect the identity of a confidential source utilized in this investigation. These vague terms are being used for the sole purpose, belief, and fear that if specific quantities, amounts, and/or locations are detailed, **WILLIAMS**, through his knowledge of past illegal drug activities would be able to identify a confidential source or misidentify an individual as a confidential source. Being identified could subject a confidential source to bodily injury or death.

26)      In early July 2020, federal and local law enforcement agencies initiated an investigation into the distribution of illegal controlled substances at **TARGET LOCATION 1.** During the course of this investigation, an Allegheny District Attorney's Narcotics Enforcement Team (DANET) Confidential Source (CS)[1] reported that FNU LNU, aka "T", sold heroin out of his residence, **TARGET LOCATION 1**.

27)      On or about July 15, 2020, the CS, at the direction of controlling agents/officers, arranged for a controlled purchase of a specific amount of heroin at **TARGET LOCATION 1**. At the direction and in the presence of controlling agents/officers, the CS contacted "T" via text to arrange for a controlled purchase of heroin. Your affiant observed communications between the CS and "T". The CS coordinated with "T" to purchase heroin at **TARGET LOCATION 1**.

28)      To prepare for the controlled purchase, law enforcement established surveillance units at **TARGET LOCATION 1**. Prior to the controlled purchase, law enforcement searched CS for narcotics and determined he/she had none on his/her person. Subsequently, surveillance units observed the CS enter the side door of **TARGET LOCATION 1** and observed the CS meet with **WILLIAMS.** Afterward, surveillance units observed the CS depart **TARGET LOCATION 1**. Thereafter, the CS informed your affiant that he/she had purchased heroin from FNU LNU, aka "O", who your affiant knows to be **WILLIAMS.** The CS provided your affiant with the suspected heroin obtained from the controlled purchase, and he/she was searched following the transaction. No other narcotics were found on CS's person.

29)      A field drug test was conducted on the suspected heroin CS provided to your affiant, and it tested positive for methamphetamine. In my training and experience, and through discussion

---

[1] The CS is cooperating with law enforcement in exchange for cash payments. The CS had been active with DANET since June 2020 and has provided information which has been independently verified and is believed to be truthful and reliable.

with other law enforcement officers, I have learned that sometimes narcotics sold as one kind, i.e. heroin, can be mixed or replaced with other narcotics, i.e. methamphetamine. I have also learned from conversations with other law enforcement officers that the field drug test results of heroin, and fentanyl sold as heroin, can sometimes appear to be positive for methamphetamine due to the cutting agents with which the heroin is mixed.

30)     On or about July 23, 2020, the CS, at the direction of controlling agents/officers, conducted a controlled purchase of a specific amount of white powder, suspected heroin, at **TARGET LOCATION 1**. At the direction and in the presence of controlling agents/officers, the CS contacted "T" via text to arrange for a controlled purchase of heroin. Your affiant observed communications between the CS and "T". The CS coordinated with "T" to purchase heroin at **TARGET LOCATION 1**.

31)     To prepare for the controlled purchase, law enforcement established surveillance units at **TARGET LOCATION 1**. Prior to the controlled purchase, law enforcement searched CS for narcotics and determined he/she had none on his/her person. Subsequently, surveillance units observed the CS enter the side door of **TARGET LOCATION 1** and observed the CS meet with **WILLIAMS.** Afterward, surveillance units observed the CS depart **TARGET LOCATION 1**. Thereafter, the CS informed your affiant that he/she had purchased the heroin from **WILLIAMS** and that "T" was also present**.** The CS provided your affiant with the suspected heroin obtained from the controlled purchase, and he/she was searched following the transaction. No other narcotics were found on CS's person.

32)     A field drug test was conducted on the white powder and it tested positive for heroin.

## CONCLUSION

33)      Based on the foregoing facts and circumstances, your affiant respectfully submits

that **WILLIAMS** is currently involved in the distribution of illegal drugs and that there is probable

cause to believe that at the **TARGET LOCATIONS** there exists evidence, fruits, and

instrumentalities of violations of Title 21, United States Code, Sections 841, as fully described in

Attachment B to this affidavit, which is attached hereto and incorporated herein.


/s/ Andrew Ellenberger_____
Andrew Ellenberger
Special Agent
Drug Enforcement Administration


Subscribed and sworn to before me,
by telephone pursuat to Fed. R. Crim. 4.1(b)(2)(A),
this 31st day of July, 2020


_____
THE HONORABLE PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## LOCATIONS TO BE SEARCHED

A)      **TARGET LOCATION 1** is a two-story, single family residence located at 1901 Craig

Street, McKeesport, PA 15132, with blue siding, a grey shingle roof, and white trim. On the north-

west corner of the house is "1901" in white letters. The residence is located at the end of Craig St.

This application seeks authorization to search the entire premises at 1901 Craig St, including any

detached structures on the curtilage, and all safes, computers, and telephones located therein.



B)      **TARGET LOCATION 2**:  the person of Obadiah WILLIAMS, a black male, with a date

of birth of 06/17/1975, pictured below, provided that this person is located within the Western

District of Pennsylvania at the time of the search.



**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED**

All records, instrumentalities, fruits and evidence relating to violations of: Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, including those items described in Sections I and II below.

**SECTION I**

1.    Controlled substances to include crack, cocaine, heroin and marijuana;

2.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, "stamp bags," microwave ovens, heat-sealing devices, and dilutants such as mannitol, mannite, inositol, fentanyl, and vitamin B12;

3.    Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

4.    Personal books, papers, cellular phones, and other electronic devices reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances, money laundering, and the criminal use of communication facilities;

5.    Cash, currency, and records relating to the generation of income from the sale of controlled substances and the expenditure of such income, including money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, as well as consumer items such as expensive televisions and other electronic equipment, precious metals such as gold and silver, and precious gems such as diamonds (this evidence often is located in a safe) – it should be noted that possession of the valuable items referenced in this paragraph, particularly by individuals with no substantial legitimate source of income, is evidence of drug trafficking as opposed to drug use;

6.    Documents and other records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

7.    Firearms, ammunition, and other dangerous weapons and ammunition;

8.    Identification evidence and/or indicia (such as mail, deeds, leases, rental agreements, photographs, bills, and identification documents) that tend to identify the person(s) in residence, occupancy, control, or ownership of subject premises and/or subject communication devices.

## Section II

1.  Computers, cellular telephones, electronic tablet devices, and other electronic media utilized for communication, transportation, and data acquisition and retention purposes related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

    *This application specifically seeks authorization to search the content of any cell phones located within the SEARCH LOCATION.

2.  Any computer equipment and storage device capable of being used to commit, further or store evidence of the federal offenses listed above;

3.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners capable of being used to commit, further or store evidence of the federal offenses listed above;

4.  Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants capable of being used to commit, further or store evidence of the federal offenses listed above;

5.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

6.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

7.  Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data;

8.  Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

## Section III

Off-site searching of such hardware, software, documentation, and storage media may be conducted and shall be limited to searching for the items described in Sections I and II of this attachment and shall be done according to the procedures set out below.

The examination of electronic information may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, which might expose many parts of the Subject Device to human inspection in order to determine whether it is evidence described by the warrant.

Agents are authorized to seize and remove from the premises the computer hardware, software, related documentation, and storage media, so that computer analysts can accurately retrieve the items authorized by this warrant in a laboratory or other controlled environment.  The retrieval process does not need to be completed within 10 days after the date of the warrant or before the return of the written inventory required by Fed. R. Crim. P. 41(a).